C.K. Lee, Esq., *admitted pro hac vice*
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
Email: cklee@leelitigation.com

David Alan Makman, Esq.
SBN: 178195
MAKMAN & MALTZ LLP
655 Mariner's Island, Suite 306
San Mateo, CA 94404
Tel: 650-242-1560
Fax: 650-242-1547
Email: david@makmanlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LYNN MOORE, SHANQUE KING, and JEFFREY AKWEI,<br><br>Plaintiffs,<br><br>v.<br><br>TRADER JOE'S COMPANY,<br><br>Defendant. | Case No.: 3:18-cv-04418-KAW<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br><br>Judge:      Hon. Kandis A. Westmore<br>Courtroom: __<br>Date:       March 21, 2019<br>Time:       1:30 P.M. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………..ii

INTRODUCTION  …………………………………………………………………1

ARGUMENT …………………………………………………………………...3

    I.     Plaintiffs Plausibly Allege that the Products Are Adulterated ………………..3

    II.    Plaintiffs Plausibly Allege that Reasonable Consumers
          Would Be Deceived by Defendant's Labeling …………………………………5

    III.   Plaintiff's Claims Satisfy Rule 9(b)'s Pleading Standards ……………………12

    IV.   Plaintiffs' State Law Claims Are Not Preempted ………………………….13

    V.    Plaintiffs' Claims Are Not Barred by Safe Harbor Doctrine ………………….18

    VI.   Defendant Made False Express Representations………………………………19

    VII.  This Action Can Proceed as a Nationwide Class Action ...……………………19

CONCLUSION ……………………………………………………………………23

1

# TABLE OF AUTHORITIES

2

3

**Cases**

4

*Bautista v. Valero Mktg. & Supply Co.*,
  No. 15-cv-05557-RS, 2016 U.S. Dist. LEXIS 95486 (N.D. Cal. July 21, 2016) .......... 12

5

6

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................... 2, 12

7

8

*Bimont v. Unilever U.S., Inc.*,
  No. 14-CV-7749 (JPO), 2015 U.S. Dist. LEXIS 119908 (S.D.N.Y. Sep. 9, 2015) ...... 14

9

10

*Brazil v. Dole Food Co.*,
  No. 12-CV-01831-LHK, 2013 U.S. Dist. LEXIS 136921 (N.D. Cal. Sep. 23, 2013)...21

11

12

*Broder v. Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005) ................................................................................... 18

13

14

*Bruton v. Gerber Prods. Co.*,
  No. 15-15174, 2017 U.S. App. LEXIS 12833 (9th Cir. July 17, 2017)..........................5

15

16

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) ................................................................................................. 17

17

*Clancy v. Bromley Tea Co.*,
  308 F.R.D. 564 (N.D. Cal. 2013) ............................................................................. 21

18

19

*Concha v. London*,
  62 F.3d 1493 (9th Cir. 1995) .................................................................................... 13

20

21

*Donohue v. Apple, Inc.*,
  871 F. Supp. 2d 913 (N.D. Cal. 2012) ..................................................................... 19

22

23

*Ebner v. Fresh, Inc.*,
  838 F.3d 598 (9th Cir. 2016) ......................................................................................7

24

25

*Forcellati v. Hyland's, Inc.*,
  876 F. Supp. 2d 1155 (C.D. Cal. 2012).................................................................... 20

26

27

*Gaidon v. Guardian Life Ins. Co.*,
  94 N.Y.2d 330 (1999)............................................................................................... 11

28

*Garrison v. Whole Foods Mkt. Grp., Inc.*,
  2014 WL 2451290 (N.D. Cal. June 2, 2014) ............................................................ 11

*Hawkins v. Kroger Co.*,
  906 F.3d 763 (9th Cir. 2018) ................................................................. 14, 15

*Hill v. Roll Int'l Corp.*,
  128 Cal. Rptr. 3d 109 (Cal. Ct. App. 2011) ............................................. 6

*Hindsman v. GM LLC*,
  No. 17-cv-05337, 2018 U.S. Dist. LEXIS 92319 (N.D. Cal. June 1, 2018) ................. 22

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
  275 F. Supp. 3d 910 (N.D. Ill. 2017) .......................................................... 9

*In re iPhone 4S Consumer Litig.*,
  No. C 12-1127 CW, 2013 U.S. Dist. LEXIS 103058 (N.D. Cal. July 23, 2013) .......... 20

*In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litigation*,
  758 F. Supp. 2d 1077 (S.D. Cal. 2010) ...................................................... 19

*Johnson v. Nissan N. Am., Inc.*,
  272 F. Supp. 3d 1168 (N.D. Cal. 2017) ...................................................... 23

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) .................................................................. 12

*Koenig v. Boulder Brands, Inc.*,
  995 F. Supp. 2d 274 (S.D.N.Y. 2014) ........................................................ 11

*Lack v. Cruise Am., Inc.*,
  No. 17-cv-03399-YGR, 2017 U.S. Dist. LEXIS 142344 (N.D. Cal. Sep. 1, 2017) ...... 13

*Langan v. Johnson & Johnson Consumer Cos.*,
  897 F.3d 88 (2d Cir. 2018) ...................................................................... 22

*Linear Tech. Corp. v. Applied Materials, Inc.*,
  152 Cal.App.4th 115 (Cal. Ct. App. 2007) ................................................... 11

*Linear Technology Corp. v. Applied Materials, Inc.*,
  152 Cal.App.4th 115 (2007) .................................................................... 2

*Mazza v. Am. Honda Motor Co.*
  666 F.3d 581 (9th Cir. 2012) .............................................................. 19, 21

*McCrary v. Elations Co., LLC*,
  2014 WL 12591473 (C.D. Cal. Mar. 24, 2014) ............................................. 11

*McKell v. Washington Mutual, Inc.*,
  142 Cal.App.4th 1457 (2006)................................................................2

*McKinniss v. Kellogg USA*,
  No. CV 07-2611, 2007 U.S. Dist. LEXIS 96106 (C.D. Cal. Sep. 19, 2007) ..................8

*McKinniss v. Sunny Delight Bevs. Co.*,
  No. CV 07-02034, 2007 U.S. Dist. LEXIS 96108 (C.D. Cal. Sep. 4, 2007)..................6

*Moore v. Kayport Package Express, Inc.*,
  885 F.2d 531 (9th Cir. 1989)..............................................................13

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008) .........................................................21

*Peacock v. The 21st Amendment Brewery Cafe, LLC*,
  No. 17-cv-01918-JST, 2018 U.S. Dist. LEXIS 7537 (N.D. Cal. Jan. 17, 2018) ..........22

*Pecover v. Elec. Arts Inc.*,
  No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632 (N.D. Cal. Dec. 21, 2010).......20

*Rubenstein v. Neiman Marcus Grp. Ltd. Liab. Co.*,
  687 F. App'x 564 (9th Cir. 2017) ........................................................12

*Sitt v. Nature's Bounty, Inc*.,
  2016 WL 5372794 (E.D.N.Y. Sep. 26, 2016)................................................11

*United States v. Two Bags, Poppy Seeds*,
  147 F.2d 123 (6th Cir. 1945) .............................................................5

*Vess v. Ciba-Geigy Corp.*,
  317 F.3d 1097 (9th Cir. 2003) ...........................................................12

*Werbel v. Pepsico, Inc.*,
  No. C 09-04456 SBA, 2010 U.S. Dist. LEXIS 76289 (N.D. Cal. July 1, 2010) .........2, 8

*Werdebaugh v. Blue Diamond Growers*,
  No. 12-CV-02724-LHK, 2013 U.S. Dist. LEXIS 144178 (N.D. Cal. Oct. 2, 2013) .....20

*Williams v. Gerber Prods. Co.*,
  523 F.3d 934 (9th Cir. 2008).............................................................2

**Statutes**

21 U.S.C. § 342(b) ........................................................................3

21 U.S.C. § 343(i)(2) ..............................................................................................14

21 U.S.C. Sec. 301, *et seq.*..................................................................................3

California Health & Safety Code § 109875 *et seq.* ..........................................3

**Other Authorities**

FDA, Proper Labeling of Honey and Honey Products: Guidance for Industry (Feb. 2018) ............................................................................................4, 14, 15

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................12, 13

**Regulations**

21 C.F.R. § 102.5(c) ..............................................................................................16

21 C.F.R. §§ 102.5(a) and (d) ..............................................................................14

**INTRODUCTION**

Plaintiffs LYNN MOORE, SHANQUE KING, and JEFFREY AKWEI ("Plaintiffs") hereby respectfully submit this Opposition to Defendant TRADER JOE'S COMPANY ("Trader Joe's" or "Defendant") Motion to Dismiss, or, in the Alternative, Motion to Strike, Plaintiffs' First Amended Complaint ("Def. Mem."). On July 20, 2018, Plaintiffs brought a Class Action Complaint seeking redress for the unfair and deceptive business practices whereby Defendant markets and labels its Trader Joe's Manuka Honey product ("the Product"). On December 21, 2018, Plaintiffs filed their First Amended Class Action Complaint ("Amended Complaint" or "Am. Compl."). On January 18, 2019, Defendant filed its Motion to Dismiss, or, in the Alterative, Motion to Strike, Plaintiffs' Amended Complaint, which Plaintiffs here oppose.

Some of Defendant's labels state that that Product is "100% New Zealand Manuka Honey" while others state only "New Zealand Manuka Honey." Regardless of the front label, the ingredients statement lists only one ingredient, manuka honey. Thus, the ingredients statement alone would lead a reasonable consumer to conclude that the Product is "100%" manuka honey, whether or not this is also represented on the front label. Since "Manuka Honey" is the only ingredient listed, the labels cause consumers to wrongfully believe.

Plaintiffs' testing confirms that Defendant's representations are false. The Product only contains between about 57.3% to 62.6% manuka honey. As a result, the Product is mislabeled and is misleading to consumers. No matter which of the Defendant's representations consumers encounter, they will have been deceived. Manuka honey is not the only ingredient in the Product. The Product is not 100% manuka honey.

While the finished Product includes manuka honey, Defendant does not take reasonable measures to ensure that the Product is made entirely from manuka honey. Almost half of the Product's content is derived from non-manuka honey. In other words, the Product has been adulterated by the inclusion of cheaper honey. Throughout the advertising of the Product, Defendant has consistently conveyed uniform and deceptive

manuka honey purity claims to consumers through both the Product's labeling and website representations. This lawsuit seeks redress for the misleading manner in which the Defendant has marketed the Product and continues to market the Product.

Plaintiffs need only assert factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff's claim to relief must be "plausible on its face," *Id*. at 570, and a complaint fails if it merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 557). However, "[t]he plausibility standard [on a motion to dismiss] is not akin to a probability requirement." *Iqbal*, 129 S. Ct. at 1937.  Plaintiffs need only "nudge" their allegations "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 548.

In the consumer fraud context, courts in this district, circuit, and state look upon motions to dismiss with disfavor and grant them only seldomly.  *See Werbel v. Pepsico, Inc.*, No. C 09-04456 SBA, 2010 U.S. Dist. LEXIS 76289, at *8 (N.D. Cal. July 1, 2010) ("The question of whether a business practice is deceptive generally presents a question of fact not suited for resolution on a motion to dismiss."); *Williams v. Gerber Prods. Co.*, 523 F.3d 934, 939 (9th Cir. 2008) ("The facts of this case, on the other hand, do not amount to the rare situation in which granting a motion to dismiss is appropriate."); *Linear Technology Corp. v. Applied Materials, Inc*., 152 Cal.App.4th 115, 134-35 (2007) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer.") (quoting *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1472 (2006)).

**ARGUMENT**

## I.   Plaintiffs Plausibly Allege that the Products Are Adulterated

Defendant's Product is adulterated under identical Federal[1] and state[2] law, including FDA regulations[3] that are incorporated into state law.[4]

Defendant mixes honey for which manuka is not the chief floral source with honey for which manuka is the chief floral source. It thereby creates large batches of honey that are slightly more than 50% from manuka. As stated in Plaintiffs' Amended Complaint:

> Defendant's production process constitutes adulteration because it amalgamates honey from many different hives and only afterwards measures the manuka honey content of the mixture. Defendant thereby deliberately adulterates high-manuka honey by diluting it with less valuable low-manuka honey to enable it to market the admixture as "manuka honey."

Amended Complaint at ¶ 61.

This constitutes "economic adulteration," and is documented on the youtube page of

---

[1] 21 U.S.C. § 342(b): A food shall be deemed to be adulterated—

**(b) Absence, substitution, or addition of constituents**
(1) If any valuable constituent has been in whole or in part omitted or abstracted therefrom; or
(2) if any substance has been substituted wholly or in part therefor; or
(3) if damage or inferiority has been concealed in any manner; or
(4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.

[2] Sherman Law, 110585. Any food is adulterated if any one of the following conditions exist:
(a) If any valuable constituent has been in whole or in part omitted or abstracted therefrom.
(b) If any substance has been substituted wholly or in part therefor.
(c) If damage or inferiority has been concealed in any manner.
(d) If any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight or reduce its quality or strength or make it appear better or of greater value than it is.

[3] FDA, Proper Labeling of Honey and Honey Products: Guidance for Industry (Feb. 2018).

[4] California's Sherman Food, Drug, and Cosmetic Law (the "Sherman Law") , California Health & Safety Code § 109875 *et seq.*, 109930 ("'Federal act' means the federal Food, Drug, and Cosmetic Act, as amended (21 U.S.C. Sec. 301, *et seq.*)"); Sherman Act, 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state"); *id.* 110505 ("Definitions and standards of identity, quality, and fill of container, and any amendments to the definitions and standards, adopted pursuant to the federal act in effect on the effective date of this part, or adopted on or after that date, are the definitions and standards of identity, quality, and fill of container in this state").

Defendant's supplier, which shows that honey is not tested below the "batch" level and that each "batch" consists of the pre-mixed honey of numerous hives.[5] As stated in the FDA, Proper Labeling of Honey and Honey Products: Guidance for Industry (Feb. 2018)[6] ("2018 Honey Labeling Guidance"), it is forbidden to adulterate any honey by "increasing its bulk" with a cheaper ingredient, thereby replacing a "valuable constituent" of that product with something less valuable. Pg. 7, at No. 9, Case B. The FDA's position is a reiteration of established caselaw:

> the consumer would be unaware that less expensive ingredients had been substituted and that the article was inferior to that which he expected to receive when making his purchase. The fact that the substituted article was not deleterious is immaterial. From its inception, to its last amendment, the

---

[5] As described in the attached Declaration of C.K. Lee, videos publicized by Defendant's supplier demonstrate that it mixes together the contents of many hives to create each batch of honey. The image below is from a video titled "Mānuka Honey Lab Testing," which shows that "Batch 2" consists of three 200-liter barrels of honey. The batch is only tested after the separate hives' honey has been mixed together. Defendant thereby minimizes the number of batches that have less than 50% manuka content by mixing together honey before testing, even though individual hives likely have varying amounts of manuka content, including less than 50% manuka content. The honey of such hives is not salable as "manuka honey" and is less valuable than honey with a greater manuka content.



Available at https://www.youtube.com/watch?v=__CDMrTDeZc, (last accessed Feb. 8, 2019).

[6] https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/UCM595961.pdf

Pure Food and Drugs Act was not designed primarily for the protection of merchants and traders; but was intended to protect the consuming public.

*United States v. Two Bags, Poppy Seeds*, 147 F.2d 123, 127 (6th Cir. 1945).

Defendant notes that it would not be economically sensible to mix essentially pure manuka honey with essentially pure non-manuka honey. Def. Mem., pg. 9. Defendant's conduct is quite different—it mixes many hives' honey together to ensure that each batch has somewhat more than 50% manuka, to avoid being left with some batches that are below 50% manuka and some batches marginally higher than 50% manuka. Its conduct is economically rational but legally prohibited.

The adulteration described above would be actionable even if consumers were not actually deceived.[7]

## II. Plaintiffs Plausibly Allege that Reasonable Consumers Would Be Deceived by Defendant's Labeling

Defendant argues that Plaintiffs' claims fail because no reasonable consumer could believe that the Product consisted exclusively manuka honey, arguing that "[r]easonable consumers of honey products do not expect that when they buy clover honey, orange blossom honey, or manuka honey, they are paying for honey that is produced exclusively from the nectar of clovers, orange blossoms, or manuka flowers." Def. Mem., pg. 12. However, the question is not simply whether reasonable consumers would expect a product labeled "Manuka Honey" to consist entirely of Manuka honey but whether they would be led to believe this after (1) viewing a product labeled "100% New Zealand Manuka Honey" and/or (2) viewing a ingredients statement that lists manuka honey as the sole ingredient. A reasonable consumer might think it unlikely for "Manuka Honey" to consist in pure

---

[7] "[T]he reasonable consumer test is a requirement under the UCL's unlawful prong only when it is an element of the predicate violation. . . .The predicate violation here is of California's Sherman Law, *see* Cal. Health & Safety Code §§ 110760, 110765, which itself incorporates standards set by FDA regulations, see id. §§ 110100, 110670. These FDA regulations include no requirement that the public be likely to experience deception." *Bruton v. Gerber Prods. Co.*, No. 15-15174, 2017 U.S. App. LEXIS 12833, at *6-7 (9th Cir. July 17, 2017).

manuka honey <u>as a general matter</u> but then be persuaded that this is in fact the case in the <u>specific context</u> of Defendant's supplemental representations.   It is reasonable for consumers to rely on label representations.

Defendant argues that "[t]he 'reasonable consumer' is not the 'least sophisticated' or 'unwary' consumer." Def. Mem., pg. 10 (quoting *Hill v. Roll Int'l Corp.*, 128 Cal. Rptr. 3d 109, 115–16 (Cal. Ct. App. 2011)).   But other courts have disagreed, observing that "a reasonable consumer may be unwary or trusting." *McKinniss v. Sunny Delight Bevs. Co.*, No. CV 07-02034, 2007 U.S. Dist. LEXIS 96108, at *8 (C.D. Cal. Sep. 4, 2007).   Whatever their presumed level of sophistication, reasonable consumers are entitled to take a manufacturer's express representations at face value on the assumption that laws against consumer fraud are being obeyed.

Defendant also contends that, since "[r]easonable consumers of specialty products are familiar with common traits of those products,… a reasonable consumer of manuka honey would understand the Product's purity based on its grading under UMF standards." Def. Mem., pg. 13.   According to Defendant, the Product's "purity rating—a 10+ grading under Unique Manuka Factor ("UMF") standards" is "much lower than that of other manuka honeys" and would therefore alert reasonable consumers that the Product "has less manuka content than products with higher ratings, like 15+ or 22+." Def. Mem., pg. 11.

However, Defendant is imputing to Plaintiffs knowledge that is only reasonably possessed by industry insiders.   Reasonable consumers of manuka honey may know that manuka purity and quality vary from brand to brand, but it does not follow that they are familiar with the esoteric UMF grading system invoked by Defendant.   While Defendant invokes this system in its legal defense, it did not actually obtain UMF certification for the Product.   If it did, perhaps Defendant could argue that reasonable consumers can go to the UMF website and looked up the meaning of "10+."   But a bare "10+" is in fact all they see, with no elucidation of either its meaning or where to discover it.   In such circumstances, reasonable consumers will either ascribe no significance to "10+" or conclude that it denotes a high manuka content, given that things are often graded on a one-to-ten scale in

our culture.  Certainly, they would not be able to deduce the Product's manuka pollen count from this number.  Defendant's argument might be somewhat stronger if the Product was sold only in specialty honey shops.  But it is in fact sold at Trader Joe's, a mass market nationwide supermarket chain.

Further, Defendant is really comparing apples and oranges in invoking the UMF grading system, since UMF measures the degree of bioactivity normally associated with manuka honey, not manuka honey purity.  Different batches of manuka honey have different levels of such activity independent of their purity.  For example, depending on how long the honey has "aged," a high-purity batch could still have a low UMF rating. Since there the correlation between purity and UMF or any other manuka grading system is highly imperfect, there is no way to deduce the one from the other.

Defendant attempts to support its claim that consumers of specialized products have specialized knowledge of those products with *Ebner v. Fresh, Inc.*, 838 F.3d 598, 967 (9th Cir. 2016), which it interprets as holding that "consumers of high-end lip gloss know and expect that some product remains in the tube to anchor the gloss and that the tube will contain a screw mechanism to advance the product out of the tube and a weighted bottom to keep the tube upright."  Def. Mem., pg. 13.  However, this decision had nothing to do with specialized knowledge of specialty products:

> Just as the reasonable consumer understands that additional product may remain in the dispenser tube after the screw mechanism prevents further advancement of the lip bullet, the reasonable consumer also understands that some additional weight at the bottom of the tube — not consisting of product — may be required to keep the tube upright.

*Id.* at 967.

In other words, reasonable consumers would not have been deceived owing to their general knowledge of basic physics and mechanics, not because they have specialized knowledge of a particular product.  And there is no general knowledge at play in the instant action that could have preempted the impression that the Product consists entirely in manuka honey.

Defendant's other citations are also unconvincing.  The court in *Werbel v. Pepsico, Inc.*, *see* Def. Mem., pg. 11, found that reasonable consumers would not be deceived into believing that Cap'n Crunch's "Crunch Berries" cereal contained real fruit berries because, among other reasons, there were no "representations that the cereal is made with real fruit or is nutritious," the product having been "described as a 'SWEETENED CORN & OAT CEREAL' and shown as brightly-colored balls of cereal that no reasonable consumer would believe are made from real berries."  *Werbel v. Pepsico, Inc.*, No. C 09-04456 SBA, 2010 U.S. Dist. LEXIS 76289, at *11-12 (N.D. Cal. July 1, 2010).  By contrast, the Product in the instant action was named "100% New Zealand Manuka Honey," with the single-ingredient ingredient statement reinforcing the claim that it consists entirely of manuka honey.

Similarly, the court in *McKinnis v. Kellogg USA*, *see* Def. Mem., pg. 11, held that reasonable consumers would not have been deceived that "Froot Loops" cereal contained real fruit because, among other reasons, "the depiction of fruit on a product label is not a specific affirmation that a product contains <u>any fruit at all</u>." *McKinniss v. Kellogg USA*, No. CV 07-2611, 2007 U.S. Dist. LEXIS 96106, at *11-12 (C.D. Cal. Sep. 19, 2007).  Moreover, the "[t]he front panel of the box clearly and accurately describe[d] the product as a 'SWEETENED MULTI-GRAIN CEREAL', not any sort of fruit-based cereal, and the side panel list[ed] all of the ingredients, which do not include fruit."  *Id*. at 12-13.  Again, the contrast with the instant action is stark, since the ingredient list in this case does <u>not</u> list all the ingredients and Defendant expressly represents the Product as "100% New Zealand Manuka Honey."

Of course, Defendant argues that "100% New Zealand Manuka Honey" could be interpreted as meaning only that all the manuka honey in the Product comes from New Zealand, not that all the honey is manuka, and claims that "[t]he phrase '100% New Zealand Manuka Honey' is accurate whether the consumer interprets the "100%" to refer to the manuka honey or to the fact that the honey comes entirely from New Zealand."  Def. Mem, pgs. 12-13 n.10.  In this connection, Defendant cites *In re 100% Grated Parmesan*

*Cheese Mktg. & Sales Practices Litig*., 275 F. Supp. 3d 910, 926 (N.D. Ill. 2017), which held that "100% Grated Parmesan Cheese" could mean either that the product was entirely cheese or merely that all of the cheese therein had been grated, and that reasonable consumers could resolve the ambiguity by looking for clarification elsewhere on the label, where detailed information of the exact ingredients was provided.  Consumers of the Product did not have this option, however, since the ingredients statement only reinforces the front label deception.  Defendant argues that the Product's "10+" would resolve the putative ambiguity.  But as explained above, this representation provides no meaningful information.

Defendant implausibly argues that "[a] reasonable consumer would not expect the Product to contain only honey from the nectar of manuka flowers. All honey contains pollen from multiple sources because, as Plaintiffs concede, honey producers cannot fully control which flowers bees visit." Def. Mem., pg. 12.  But while the reasonable consumer of manuka honey may know that different brands are characterized by varying degrees of purity, he is not a beekeeper with first-hand knowledge of the challenges involved in controlling bees' pollinating behaviors.  Defendant purposefully misrepresents the content of the Products yet places the burden on consumers to see past its deceptions.

Moreover, even if reasonable consumers know generally that bees cannot be deterred from pollinating whatever plants are in the vicinity, they do not know the make-up of the plant life in whatever region of New Zealand the honey for the Product is sourced.  They do not know that it is impossible to place beehives in areas populated exclusively by manuka plants or to destroy whatever non-manuka plant life is in the area in order to guarantee product purity.  It is entirely possible for reasonable consumers to believe that Defendant harvests the contents of the Product from a unique field where the only floral inhabitants are manuka trees.

Defendant also argues that the Product's price indicates it contains less manuka than other more expensive manuka honeys.  *See* Def. Mem., pgs. 11, 13, 14.  But again, a reasonable consumer of manuka honey is not necessarily a connoisseur of manuka honey.

He knows that manuka honey is expensive relative to regular honeys and that purer manuka is generally more expensive (as with a great many products). But it does not follow that he can deduce a honey's actual manuka content from its price, as Defendant claims is possible, especially when Trader Joe's store-brand manuka honey does not sit alongside other brands with which it could be compared.

Moreover, a reasonable consumer could believe that Defendant had unique business operational efficiencies that enabled lower production costs, since consumers routinely patronize Trader Joe's in the expectation of finding high-quality products that are discounted relative to competitors. *Business Insider* explains:

> Customers love Trader Joe's because of its relatively low prices.
>
> During a recent trip to a Trader Joe's location in New York City, the cheapest available ground beef cost $4.99 a pound, compared with $9.99 at a New York Whole Foods location, which was selling only organic. The lowest price for a liter of extra-virgin olive oil was $6.99 at Trader Joe's, compared with $9.99 for the same size at Whole Foods.
>
> **Consumers view Trader Joe's as high quality but inexpensive**. How can Trader Joe's afford to keep its prices so low?
>
> The biggest reason is that Trader Joe's sells private-label products instead of well-known brands.
>
> Eighty percent of the products carried by Trader Joe's are in-house. While that means customers can't get those products anywhere else, it also means the grocer buys those goods directly from suppliers, cutting out the middlemen in a supply chain that can drive up costs.[8]

Given these customary expectations regarding Trader Joe's private-label products, reasonable consumers cannot be expected to deduce from the Products' pricing that the Products could not possibly consist in pure manuka, especially with Defendant having gone out of its way to communicate so much.

---

[8] https://www.businessinsider.com/here-is-why-trader-joes-is-so-cheap-2017-5 (emphasis added)

1    In sum, the crux of Defendant's argument is that the deceptiveness its <u>express</u>

2    <u>misrepresentations</u> regarding the Product's manuka content, issued on both the front label

3    and/or the ingredients list, should somehow be offset by meaningless "10+" designations

4    and consumers' specialized knowledge of beekeeping and manuka economics.  These are

5    not reasonable demands to make of consumers.

6    Defendant's fanciful expectations confirm that the instant case is not among the rare

7    exceptions to the general principle that deceptiveness to a reasonable consumer presents a

8    factual question that cannot be adjudicated on a motion to dismiss.  *See Garrison v. Whole*

9    *Foods Mkt. Grp., Inc*., 2014 WL 2451290, at *2 (N.D. Cal. June 2, 2014) ("Whether a

10   reasonable consumer is likely to be deceived is a question of fact, and therefore typically

11   not appropriate for resolution on a motion to dismiss."); *McCrary v. Elations Co., LLC*,

12   2014 WL 12591473, at *3 (C.D. Cal. Mar. 24, 2014) ("Generally, the question of whether

13   a business practice is deceptive presents a question of fact not suited for resolution on a

14   motion to dismiss."); *Gaidon v. Guardian Life Ins. Co*., 94 N.Y.2d 330, 345 (1999)

15   (reviewing decision granting a motion to dismiss a GBL § 349 claim and noting "[t]he

16   issue before us is not whether, as a matter of law, reasonable consumers would be misled

17   in a material way, but whether that prospect is enough to create a question of fact."); *Koenig*

18   *v. Boulder Brands, Inc*., 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("Because it is unclear

19   to the Court whether, as a matter of law, a reasonable consumer might be confused or

20   misled about the fat content of Smart Balance based upon its packaging, the Court DENIES

21   Defendants' motion to dismiss on this basis."); *Sitt v. Nature's Bounty, Inc*., 2016 WL

22   5372794, at *14 (E.D.N.Y. Sep. 26, 2016) ("Whether a reasonable consumer could infer

23   from Defendants' statement … that the Product also complies with USP specifications …

24   is a question of fact that cannot be resolved on a motion to dismiss."); *Linear Tech. Corp.*

25   *v. Applied Materials, Inc*., 152 Cal.App.4th 115, 134–35 (Cal. Ct. App. 2007) ("Whether a

26   practice is deceptive, fraudulent, or unfair is generally a question of fact which requires

27   'consideration and weighing of evidence from both sides' and which usually cannot be

28   made on demurrer.").

### III.   Plaintiffs' Claims Satisfy Rule 9(b)'s Pleading Standards

Plaintiffs' common law fraud claim[9] satisfies Fed. R. Civ. P. 9(b)'s heightened pleading standard, and Plaintiffs' remaining claims are not subject to the strictures of common law fraud claims. Moreover, a relaxed version of the Rule 9(b) standard applies because many relevant facts are in sole possession of Defendant and its suppliers.

*Plaintiffs' Common Law Fraud Claim  Satisfies Rule 9(b)'s Heightened Pleading Standard*

"Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quotation marks and citations omitted). Plaintiffs' Amended Complaint alleges all details regarding Plaintiffs' purchases and the role that Defendant's false labeling had in motivating their purchases. Am. Compl., at ¶¶  26-31.

*Plaintiffs' Statutory Claims Are Independent of their Common Law Fraud Claims*

Plaintiffs' statutory consumer fraud claims are not contingent on their common law fraud claims, and so they would not be affected were the common law claims dismissed. "[U]nder the UCL, CLRA, and FAL . . . fraud is not an essential element." *Bautista v. Valero Mktg. & Supply Co.*, No. 15-cv-05557-RS, 2016 U.S. Dist. LEXIS 95486, at *6 (N.D. Cal. July 21, 2016) (citing *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1105 (9th Cir. 2003)). Plaintiffs need only "[allege] enough facts to raise a reasonable expectation that discovery will reveal evidence to support her FAL, CLRA, and UCL claims." *Rubenstein v. Neiman Marcus Grp. Ltd. Liab. Co.*, 687 F. App'x 564, 566 (9th Cir. 2017) (citing *Twombly*, 550 U.S. at 556), internal marks omitted). The Amended Complaint alleges specific facts about Defendant's practices that raise a reasonable expectation that discovery will reveal evidence. Am. Compl., at ¶¶  35-63.

Rule 9(b) requires only that a pleading contain information sufficient such "that a defendant can respond to the allegations adequately. However, the rule is not so stringent as to bar claims where specific details, not essential to preparing a defense, are not alleged."

---

[9] Count X of the Amended Complaint.

*Lack v. Cruise Am., Inc.*, No. 17-cv-03399-YGR, 2017 U.S. Dist. LEXIS 142344, at *6 (N.D. Cal. Sep. 1, 2017) (quotation marks and citation omitted). Defendant has not specified any additional type of information that it would require to respond to Plaintiffs' allegations. It has not done so because the Amended Complaint describes the full circumstances of Plaintiffs' purchases and Defendant's false advertisements.

*Because Many Relevant Facts Are in Sole Possession of Defendant and Its Suppliers, a Relaxed Version of the Rule 9(b) Standard Applies*

Plaintiffs satisfy the strictures of Rule 9(b), but even if they did not, Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge," *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989), because it merely "requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can reasonably be expected to have access." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). A "pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations," *Moore*, 885 F.2d at 540, and the Amended Complaint allows Defendant to prepare an adequate answer to Plaintiffs' allegations.

Here, details regarding some particular facts are known only to Defendants and will be revealed in discovery under a protective order. Plaintiffs need not have pled facts that they cannot "reasonably be expected to have access" to. *Concha*, 62 F.3d at 1503.

## IV.    Plaintiffs' State Law Claims Are Not Preempted

Defendant argues that Plaintiffs' claims should be dismissed as preempted because they "seek to impose food-labeling standards different from those set forth in the Federal Food, Drug, and Cosmetic Act ('FDCA') and by the Food and Drug Administration ('FDA')." Def. Mem., pg. 16.  However, Defendant's preemption argument fails even if the Court concludes that the Product is not adulterated and that the Product may be labeled "Manuka Honey" pursuant to FDA guidance.

1    As noted in connection with the reasonable consumer question above, the issue is
2  not simply the Product's name considered in the abstract, but "Manuka Honey" as qualified
3  by "100%" and/or an ingredients statement that lists manuka honey as the sole ingredient.
4  Defendant correctly notes, with *Hawkins v. Kroger Co.*, 906 F.3d 763, 770 (9th Cir. 2018),
5  that "if FDA regulations expressly permit [a] claim . . . on the face of a product's packaging,
6  any state law claim to the contrary would be preempted."  But there is no federal law or
7  regulation that permits Defendant to describe the Product as "100%" manuka honey when
8  its actual manuka content is considerably lower.  Thus, Plaintiffs' claim that this
9  representation is deceptive is not preempted, because federal law does not regulate purity
10  representations on honey products.  *See Bimont v. Unilever U.S., Inc.*, No. 14-CV-7749
11  (JPO), 2015 U.S. Dist. LEXIS 119908, at *6 (S.D.N.Y. Sep. 9, 2015) ("preemption does
12  not preclude a state-law claim if the state requirement is outside the scope of the relevant
13  federal requirements.").

14    As to the Product's ingredient statement, Defendant argues that "Plaintiffs'
15  ingredient-statement claims about the listing of 'manuka honey' as the sole ingredient are
16  expressly preempted because the Products comply with federal ingredient list requirements
17  by listing the single ingredient by its common or usual name."  Def. Mem., pgs. 16-17.
18  Defendant argues this in reliance on the FDA's 2018 Honey Labeling Guidance, which
19  states that a honey product may be named according to its "chief floral source" even when
20  the honey therein does not come exclusively from this source.  *See* Def. Mem., pgs. 18-19.
21  Defendant acknowledges that the Honey Labeling Guidance does not have the force of law
22  and therefore has no preemptive effect standing alone.  However, Defendant argues that
23  the Guidance "inform[s] the intended "domain" of 21 U.S.C. § 343(i)(2) and 21 C.F.R. §§
24  102.5(a) and (d) by defining the 'common or usual name' of the ingredient that is required
25  under federal law," Def. Mem., pg. 19 n.14, and thus has a preemptive effect by virtue of
26  this association.

27
28

However, Defendant conveniently excerpts the relevant FDA statements away from their total context, which entirely undercuts its argument.   The 2018 Honey Labeling Guidance reads in pertinent part:

2. How shall I name my honey?

If a food contains only honey, the food must be named "honey," which is its common or usual name (see section 403(i) of the FD&C Act and 21 CFR 101.3(b)). The common or usual name may also include the source of the honey, such as "Clover Honey," on the label. (See Q&A 3, below). Because honey is a single-ingredient food, you do not need to include an ingredient statement on the label.

(Please note that **this answer pertains solely to how you name your product**; other labeling requirements (e.g., net weight, nutrition facts) apply to the product…

3. Do I have to declare the floral source of honey?

No. You do not have to declare the floral source of honey on the label. However, you may label the honey with the name of the plant or blossom if you or the honey producer has information to support the conclusion that the plant or blossom designated on the label is the chief floral source of the honey. Names such as "Orange Blossom Honey," "Clover Honey," or "Wild Flower Honey" are acceptable. (See FDA Compliance Policy Guide, section 515.300.) Any claims about the floral source of the honey must be truthful and not misleading (see section 403(a)(1) of the FD&C Act).

2018 Honey Labeling Guidance, pg. 5 (emphasis added)

The highlighted language clarifies that while "Manuka Honey" may be permissible as the common or usual name of a product that is a combination of manuka and other honeys for purposes of the product's name, this does not hold true for purposes of the ingredients statement.   In this case as in some others, a representation that may be non-deceptive and permissible when placed one part of the label may still be deceptive and unlawful when placed on another.   *See Hawkins*, 906 F.3d at 770. ("In *Reid*, we determined that the statement 'No Trans Fat' was not allowed outside of the Nutrition Facts Panel since the product did contain trans fat, notwithstanding that the Nutrition Facts Panel reported that it contained 0g trans fat.").

Such a dual-standard standard is sensible in the honey context. Reasonable consumers understand that the name of a honey product, like that other products, conveys only limited, general information about the contents, and that they should therefore turn to other parts of the label, like the ingredients statement, for more details. Since the purpose of the ingredients statement is to provide a more exhaustive account of a product's make-up, listing "manuka honey" as the Product's sole ingredient is deceptive in a way that using "manuka honey" as the Product's name might not be. This is why the FDA statements regarding the common or usual names of honey products are <u>expressly limited to product names</u>, not other regions of the label. "Manuka Honey" as a product name merely communicates to consumers that the product is more appropriately classified as manuka honey than, say, clover honey. But "Manuka Honey" in the ingredients statement communicates to consumers that the product consists entirely of manuka honey.

The dual-standard announced in the 2018 Honey Labeling Guidance follows logically from the FDA's general parameters for determining the common or usual names of products:

> [t]he common or usual name of a food shall include a statement of the presence or absence of any characterizing ingredient(s) or component(s) . . <u>when the presence or absence of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance</u> or when the labeling or the appearance of the food may otherwise <u>create an erroneous impression that such ingredient(s) or component(s) is present when it is not</u>, and consumers may otherwise be misled about the presence or absence of the ingredient(s) or component(s) in the food.

21 C.F.R. § 102.5(c) (emphases added).

"Manuka Honey" cannot be the common or usual name of Defendant's Product for purposes of the ingredient statement given that the purity of the manuka honey at issue "has a material bearing on the price and consumer acceptance of the Products." Listing manuka honey as the sole ingredient would create "an erroneous impression" that the Product is pure manuka.

Defendant had a number of lawful options when creating its ingredient statement. The first option was to simply have no ingredient statement at all, which the excerpted language above authorizes. This would have been under-descriptive but not necessarily deceptive. Consumers would know from the Product name that the Product is predominantly manuka honey but would also know that they were taking their chances as to actual purity levels. The second lawful option would have been to list "honey" as the sole ingredient, which the FDA also authorizes for products that consist only of honey of some variety or another. *See* 2018 Honey Labeling Guidance, pg. 7 ("Consumers would know that a food product contains honey as one of the ingredients by reading the ingredient statement. A properly labeled food product would list the ingredient by its common or usual name, 'honey,' in the ingredient statement."). This too would have been under-descriptive but not necessarily deceptive. Lastly, Defendant could have simply listed all the various types of honey in the Product in descending order of predominance—e.g., Manuka honey, kanuka honey, clover honey… Yet Defendant did not choose from among this panoply of lawful ingredient statement options and instead settled upon the one approach that would deceive a reasonable consumer into believing that the Product consisted entirely in manuka honey. Since federal regulations do not countenance this choice, Plaintiffs' allegations with respect to it are not preempted.

Defendant also argues that Plaintiffs' claims are "impliedly preempted because the substance of those claims is to enforce the FDCA where they claim that the Product's labeling violates federal law, including by not using the common or usual name or by labeling honey in a manner that is misleading." Citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–53 (2001) and other cases, Defendant argues that "state-law claims that exist solely by virtue of FDCA requirements are impliedly preempted because Congress intended that the Act's requirements be enforced exclusively by the FDA." Def. Mem., pg. 20. n.15.

This is not really a preemption argument, however, and is more properly described as a "repackaging" or "piggybacking" argument, the upshot of which is that Plaintiffs' are

attempting to covertly enforce a federal law without a private cause of action through a consumer protection law with a private cause of action.  As Defendant correctly notes, this presupposes that Plaintiffs' state-law claims "exist solely by virtue of FDCA requirements."  In this vein, *Broder v. Cablevision Sys. Corp*. observed that plaintiff "does not make a free-standing claim of deceptiveness under GBL § 349 that happens to overlap with a possible claim under PSL § 224-a(4). He claims, instead, that 'Defendants' conduct in failing to provide plaintiff and the Class . . . with the notice of the Winter Season rates as required under PSL § 224-a(4) constitutes materially deceptive acts or practices' actionable under GBL § 349."  *Broder v. Cablevision Sys. Corp*., 418 F.3d 187, 200 (2d Cir. 2005)

But nowhere does Defendant explain why Plaintiffs' claims of deception are logically reliant on FDA requirements—that is, why they are not "free-standing" and do not just "happen[] to overlap" with FDA requirements.  Self-evidently, these claims are free-standing, as they are supported by the common sense of the reasonable consumer and are unaffected by federal regulations (with which Plaintiffs' arguments are <u>consistent</u> but on which they are <u>not dependent</u>).  Plaintiffs' arguments regarding the deceptiveness of appending "100%" to "New Zealand Manuka" and listing "Manuka Honey" as the sole ingredient are arguments about how reasonable consumers interpret these claims, not about the contents of the Federal Register.  That Defendant may disagree with these arguments does not render them preempted.

## V.     Plaintiffs' Claims Are Not Barred by Safe Harbor Doctrine

Defendant's "Safe Harbor" argument collapses with its preemption argument.  Since the challenged conduct is not authorized by federal regulations, as just explained, the provisions in state consumer fraud laws granting safe harbor to conduct that is so authorized are inapplicable to this case.

1

**VI.    Defendant Made False Express Representations**

2

Defendant's argument against Plaintiffs' Breach of Express Warranty claims is

3

essentially a reworded rehash of its failed reasonable consumer argument and so founders

4

accordingly.

5

6

**VII.   This Action Can Proceed as a Nationwide Class Action**

7

Relying on *Mazza v. Am. Honda Motor Co*. 666 F.3d 581 (9th Cir. 2012), Defendant

8

argues that "[t]he Complaint also impermissibly seeks to apply California law to the claims

9

of a putative nationwide class."  Def. Mem., pg. 22.  The argument fails for two reasons.

10

First, whether a case may proceed as a nationwide class action should be determined

11

later in the litigation, on a Rule 23 motion for class certifications.  Defendant notes that a

12

few courts have applied *Mazza* to strike nationwide classes already on a motion to dismiss.

13

But this has been the exception and not the rule.  *See Forcellati*, 876 F. Supp. 2d at 1159

14

("Until the Parties have explored the facts in this case, it would be premature to speculate

15

about whether the differences in various states' consumer protection laws are material in

16

this case… Courts rarely undertake choice-of-law analysis to strike class claims at this

17

early stage in litigation."); *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 923 (N.D. Cal.

18

2012) ("Although *Mazza* may influence the decision whether to certify the proposed class

19

and subclass, such a determination is premature" at the pleading stage.); *In re Sony Grand*

20

*Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litigation*, 758 F. Supp.

21

2d 1077, 1096 (S.D. Cal. 2010)("In a putative class action, the Court will not conduct a

22

detailed choice-of-law analysis during the pleading stage."); *Werdebaugh*, 2013 U.S. Dist.

23

LEXIS 144178, at *55-56 ("the Court finds that striking the nationwide class allegations

24

at this stage of this case would be premature").

25

Second, while Defendant abstractly enumerates the general considerations that led

26

the *Mazza* court to hold that California law could not be applied to out-of-state class

27

members *in that case*, Defendant does not actually provide anything resembling the

28

1    thorough choice-of-law analysis that underpinned the *Mazza* decision.  Since Defendant is

2    headquartered in California, applying California law to out-of-state class members would

3    doubtlessly be constitutional.  With this clearly established, it is *Defendant's* burden to

4    establish that California law nevertheless should not be applied owing to differences in the

5    relevant states' laws and the comparative strengths of each states' interest in having its

6    laws applied.  *See Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS

7    140632, at \*47 (N.D. Cal. Dec. 21, 2010) ("If this due process test is satisfied, the

8    presumption under California choice-of-law rules is that California law applies; the burden

9    of showing otherwise rests with the party seeking to invoke foreign law."); *Mazza*, 666

10   F.3d at 589-90 ("Once the class action proponent makes this showing [of constitutionality],

11   the burden shifts to the other side to demonstrate that foreign law, rather than California

12   law, should apply to class claims.") (internal quotes and citation omitted).

13        Not only does Defendant's argument not meet this burden, it *does not even attempt*

14   *to do so*.  And courts in this District and elsewhere are united that cursory invocations of

15   *Mazza* are no substitute for this hard work.  See *In re iPhone 4S Consumer Litig.*, No. C

16   12-1127 CW, 2013 U.S. Dist. LEXIS 103058, at \*29 (N.D. Cal. July 23, 2013) ("various

17   district courts have rejected the argument that Apple makes here, concluding that *Mazza* did

18   not allow the defendants to substitute *Mazza*'s holding in lieu of [their] own careful analysis

19   of choice-of-law rules as applied to this particular case.") (internal quotes and citations

20   omitted); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1159 (C.D. Cal. 2012)

21   ("*Mazza* did not purport to hold that nationwide classes are, as a matter of law, uncertifiable

22   under California's consumer protection laws, which is unsurprising given the case-specific

23   nature of choice-of-law analysis. Indeed, the court made clear that its holding was cabined

24   to the facts before it"); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK,

25   2013 U.S. Dist. LEXIS 144178, at \*55-56 (N.D. Cal. Oct. 2, 2013); ("The Ninth Circuit's

26   opinion in *Mazza*—which was decided at the class certification stage and not on a motion

27   to dismiss—depended heavily on a detailed choice-of-law analysis that compared how

28   various states' consumer protection laws applied to the facts of the plaintiffs' claims… By

contrast, there has been no choice-of-law analysis in this case…"); *Brazil v. Dole Food Co.*, No. 12-CV-01831-LHK, 2013 U.S. Dist. LEXIS 136921, at *41 (N.D. Cal. Sep. 23, 2013) ("Absent the sort of detailed choice-of-law analysis that guided the Ninth Circuit in *Mazza*, the Court is unable to determine, at this stage, whether California's choice-of-law rules apply to bar all, some, or none of Brazil's class claims. Accordingly, the Court DENIES Defendants' Motion to Strike Brazil's nationwide class allegations."); *Clancy v. Bromley Tea Co.*, 308 F.R.D. 564, 572 (N.D. Cal. 2013) ("This overreads *Mazza*. *Mazza* did not establish such a bright-line rule, but rather contained a detailed choice-of-law analysis which determined that in *that case* California law should not be applied to non-California residents.").

The specific facts of Plaintiffs' claims may well dictate a different outcome from *Mazza*.  For example, Defendant notes that *Mazza* "found that each state 'has a strong interest in applying its own consumer protection laws to [automobile sales]" that take place within its boundaries."  Def. Mem., pg. 22 (quoting *Mazza*, 666 F.3d at 592.).  But by contrast with automobiles, Trader Joe's Manuka Honey is sold at Trader Joe's stores, not through a local middleman that would augment other states' interests in regulating the sale of a product.  That is, Plaintiffs and the Class were transacting <u>directly</u> with a California entity notwithstanding that the transaction took place elsewhere.  *See Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) ("While defendant's arguments are persuasive in the context of plaintiffs' warranty claims in that denials of warranty coverage might accurately be described as occurring in the state where repair was sought, they carry less force when applied to plaintiffs' claims under the CLRA and UCL. Plaintiffs allege that the wrongful acts underlying those claims emanated from defendant's California headquarters; defendant does not adequately rebut plaintiffs' showing that the representations or omissions made regarding the Tiburon emanated from California… Thus, the Court does not find a conflict between California's consumer protection laws and the applicable laws of the non-forum states.").

1    Defendant further argues that Plaintiffs lack standing to bring claims on behalf of

2    class members residing outside of California, New York, and North Carolina under their

3    states' respective consumer protection laws.   *See* Def. Mem., pg. 24.   But as with

4    Defendant's objection to a nationwide class under California law, this raises an issue that

5    is properly addressed only at the class certification stage.   *See Peacock v. The 21st*

6    *Amendment Brewery Cafe, LLC*, No. 17-cv-01918-JST, 2018 U.S. Dist. LEXIS 7537, at

7    \*29 (N.D. Cal. Jan. 17, 2018) ("On the other hand, the class certification approach finds

8    that once the named plaintiff establishes individual standing to bring a claim, the court

9    approach[es] the disjuncture as an issue of class certification, not standing… This Court

10   adopts the class certification approach.").   This now happens to be the law throughout the

11   Second Circuit.   *See Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92-93

12   (2d Cir. 2018) ("as long as the named plaintiffs have standing to sue the named defendants,

13   any concern about whether it is proper for a class to include out-of-state, nonparty class

14   members with claims subject to different state laws is a question of predominance

15   under Rule 23(b)(3)… not a question of 'adjudicatory competence' under Article III…").

16   Given that the Ninth Circuit is undecided on this question, the Court should adopt the

17   Second Circuit's approach.

18   Defendant notes the few exceptions to this principle.   But the two California cases

19   Defendant cites do not actually support its position.   *Hindsman v. GM LLC*, No. 17-cv-

20   05337, 2018 U.S. Dist. LEXIS 92319 (N.D. Cal. June 1, 2018) expressly acknowledges

21   that the "Ninth Circuit has not yet addressed whether state law claims brought on behalf of

22   putative class members by named plaintiffs from states different from the putative class

23   must be dismissed based on the named plaintiffs' lack of standing."   *Id.* at \*46.   Thus, the

24   question was really "a matter of discretion" rather than a constitutional issue.   *Id.* at \*47.

25   In that case, the court determined that a nationwide class was inappropriate because "there

26   is no named plaintiff from *any* of the other 49 states whose laws are at issue in the First and

27   Fifth Causes of Action.   *Id.* at \*48-49.   By contrast, the instant action has two non-

28   California plaintiffs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Likewise, *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1175 (N.D. Cal. 2017) noted that "[t]here is no hard and fast rule to apply" and did not permit a nationwide class to proceed because this would have "create[ed] the significant burden of nationwide discovery." *Id.* at 1175.  So, the court's decision was not based on standing, as Defendant misrepresents.  And Defendant has not argued that the burden of nationwide discovery would be significantly more burdensome than statewide discovery in California, New York, and North Carolina.  Since the Product is sold under uniform conditions in Trader Joe's stores across the country, it would not be.  Defendant might have to provide nationwide as opposed to statewide sales data, but such information should be readily available to it without creating any logistical nightmares.  Furthermore, as described in the accompanying Declaration of C.K. Lee in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss or Strike, the facts regarding the production, labeling, and adulteration of the Products occurred in New Zealand.  So, proceeding with a nationwide would not meaningfully affect the burden of discovery in this respect either.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion should be denied in its entirety

DATED: February 14, 2019

Respectfully submitted,

*/s/ C.K. Lee*
C.K. Lee, Esq.

*Attorneys for Plaintiffs and the Class*

1

**CERTIFICATE OF SERVICE**

2

3

I hereby certify that on February 14, 2019, true and correct copies of Plaintiffs'

4

Memorandum of Law in Opposition to Defendant's Motion to Dismiss or Strike Plaintiffs'

5

First Amended Complaint were served on all counsel of record via ECF.

6

7

*/s/ C.K. Lee*
C.K. Lee, Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28