DAWN SESTITO (S.B. #214011)
dsestito@omm.com
R. COLLINS KILGORE (S.B. #295084)
ckilgore@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407

Attorneys for Defendant
Trader Joe's Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LYNN MOORE, SHANQUE KING, and JEFFREY AKWEI,<br><br>Plaintiffs<br><br>v.<br><br>TRADER JOE'S COMPANY,<br><br>Defendant. | Case No. 4:18-cv-04418-KAW<br><br>**REPLY IN SUPPORT OF DEFENDANT TRADER JOE'S COMPANY'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION TO STRIKE PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. Kandis A. Westmore<br>Courtroom: _____<br>Date: Thursday, March 21, 2019<br>Time: 1:30PM |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ........................................................................................................................ 2

    A. Plaintiffs Fail to Plausibly Allege that Trader Joe's Manuka Honey Is Adulterated. ................................................................................................................ 2

        1. Plaintiffs' Assertions in the FAC Lack a Sufficient Factual Basis and Do Not Plausibly Allege Adulteration. ................................................. 2

        2. Plaintiffs' Claims of Fraudulent Conduct Must be Dismissed for Failure to Meet Rule 9(b)'s Heightened Pleading Standard. ...................... 6

    B. No Reasonable Consumer Would Expect the Product to Contain Exclusively Manuka Pollen. ................................................................................... 6

    C. Plaintiffs' State Law Claims Are Preempted and Their Labeling Claims Are Barred Because Trader Joe's Complied with Federal Law. ........................... 10

    D. Plaintiffs' Breach of Express Warranty Claims Fail Because the Product Does Not Make Any Express Representation That Is Untrue. .............................. 13

    E. Plaintiffs Cannot Proceed with a Nationwide Class. ............................................ 13

III. CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Home Prods. Corp. v. Johnson & Johnson*,
    672 F. Supp. 135 (S.D.N.Y. 1987) ............................................................................................ 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................................... 6

*Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) .................................................................................................... 6

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (Cal. 1999) ................................................................................................ 12–13

*Dabush v. Mercedes-Benz USA, Inc.*,
    874 A.2d 1110 (N.J. Super. Ct. App. Div. 2005) ..................................................................... 14

*Duke v. Flying J, Inc.*,
    178 F. Supp. 3d 918 (N.D. Cal. 2016) ...................................................................................... 13

*Durnford v. MusclePharm Corp.*,
    907 F.3d 595 (9th Cir. 2018) .................................................................................................... 11

*Ebner v. Fresh, Inc.*,
    838 F.3d 958 (9th Cir. 2016) ......................................................................................... 9, 10, 13

*Forouzesh v. Starbucks Corp.*,
    714 F. App'x 776, 777 (9th Cir. 2018) ..................................................................................... 13

*Frenzel v. AliphCom*,
    76 F. Supp. 3d 999 (N.D. Cal. 2014) ........................................................................................ 14

*Frezza v. Google, Inc.*,
    No. 5:12–cv–00237–RMW, 2013 WL 1736788 (N.D. Cal. Apr. 22, 2013) ............................ 14

*Gianino v. Alacer Corp.*,
    846 F. Supp. 2d 1096 (C.D. Cal. 2012) .................................................................................... 14

*In re Carrier IQ, Inc.*,
    78 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................................................... 15

*In re Target Corp. Data Sec. Breach Litig.*,
    66 F. Supp. 3d 1154 (D. Minn. 2014) ....................................................................................... 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*In re Trader Joe's Tuna Litig.,*
  289 F. Supp. 3d 1074 (C.D. Cal. 2017) .................................................................................. 12

*Johnson v. Nissan N. Am.*,
  272 F. Supp. 3d 1168 (N.D. Cal. 2017) .................................................................................. 15

*Lavie v. Procter & Gamble Co*,
  105 Cal. App. 4th 496 (2003) ................................................................................................... 9

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................................................ 13, 14

*McKinnis v. Kellogg USA,*
  No. CV 07-2611 ABC (RCx), 2007 WL 4766060 (C.D. Cal. Sept. 19, 2007) ..................... 8–9

*O'Toole v. Gencor Nutrients, Inc.*,
  No. CV 14-3754-R, 2017 WL 6514682 (C.D. Cal. Aug. 17, 2017) ......................................... 2

*Route v. Mead Johnson Nutrition Co.*,
  No. CV 12–7350–GW(JEMx), 2013 WL 658251 (C.D. Cal. Feb. 21, 2013) ........................ 14

*United States v. Gonzalez-Alvarez,*
  277 F.3d 73 (1st Cir. 2002) ....................................................................................................... 5

*United States v. Kohlbach*,
  38 F.3d 832 (6th Cir. 1994) ...................................................................................................... 5

*United States v. Two Bags, Each Containing 100 Pounds, Poppy Seeds*,
  147 F.2d 123 (6th Cir. 1945) .................................................................................................... 5

*Werbel v. Pepsico, Inc.*,
  No. C 09–04456 SBA, 2010, WL 2673860 (N.D. Cal. July 2, 2010) ...................................... 8

*Workman v. Plum Inc.*,
  141 F. Supp. 3d 1032 (N.D. Cal. 2015) ............................................................................. 8, 10

*Yumul v. Smart Balance, Inc.*,
  733 F. Supp. 2d 1117 (C.D. Cal. 2010) .................................................................................... 6

**Statutes**

21 U.S.C. § 342 .................................................................................................................................. 5

21 U.S.C. § 342(b) ............................................................................................................................. 3

# TABLE OF AUTHORITIES
## (continued)

Page(s)

21 U.S.C. § 343(i)(2) ............................................................................................................... 13

N.J. Stat. Ann. § 56:8–19.1 ...................................................................................................... 14

N.J. Stat. Ann. § 56:8–2 ........................................................................................................... 14

**Other Authorities**

FDA, Proper Labeling of Honey and Honey Products: Guidance for Industry (Feb. 2018), *Available at* https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/UCM595961.pdf.................................................................. 4, 11, 12, 13

FDA, Compliance Policy Guide § 515.300, Honey – Source Declaration (1980 ......................... 13

**Regulations**

21 C.F.R. § 101.4(a)(1) ...................................................................................................... 10, 12

21 C.F.R. § 102.5(a) ................................................................................................................. 13

21 C.F.R. § 102.5(d) ................................................................................................................. 13

I.      **INTRODUCTION**

Trader Joe's manuka honey is 100% manuka honey. Plaintiffs have alleged no facts to the contrary. Unable to allege anything to suggest that Trader Joe's sold honey from other flowers with a false "manuka" label or diluted manuka honey with cheaper products, Plaintiffs instead theorize that honey is "adulterated" unless at least 90% of its pollen content comes from a single type of flower. This baseless theory would not only upend the entire honey industry and defy clear FDA labeling guidance, but also contradicts Plaintiffs' own allegations about what a reasonable consumer would know about how honey is produced. In their First Amended Complaint ("FAC"), Plaintiffs admit that beekeepers cannot control which flowers their bees visit, that reasonable consumers know all honey contains pollen from multiple floral sources, and that the quality *and price* of manuka honey fluctuate with the honey's concentration of manuka pollen. These admissions all show that Trader Joe's manuka honey (the "Product"), which sold for $13.99 and, according to Plaintiffs' own tests, contained approximately 60% manuka pollen, was properly labeled and appropriately priced. Yet Plaintiffs, faced with these facts, come to the absurd conclusion that only honey containing "at least 90%" manuka pollen should carry the "manuka" name—and, thus, that a reasonable consumer would expect Trader Joe's Product to contain the same concentration of prized manuka pollen as a luxury honey that sells for more than $250 a jar. And, conceding that their FAC does not sufficiently plead a fraud claim, Plaintiffs make an offer of proof: screenshots from YouTube videos that Plaintiffs assert show Trader Joe's honey supplier "adulterating" manuka honey by mixing together honey from different hives. Plaintiffs cannot save their claim through amendments in their Opposition. But even if the Court were to consider them, they would not help Plaintiffs' claims because the videos show nothing to suggest adulteration—such as dilution of honey with non-honey ingredients—and instead show only that Trader Joe's manuka honey undergoes rigorous quality testing. In light of this proffer, it is now clear Plaintiffs' theories fail as a matter of law. The FAC should be dismissed with prejudice.

## II. ARGUMENT

### A. Plaintiffs Fail to Plausibly Allege that Trader Joe's Manuka Honey Is Adulterated.

In their FAC, Plaintiffs plead no factual basis for the assertion at the heart of their case: that Trader Joe's "adulterates" its manuka honey. In their Opposition to Trader Joe's Motion, Plaintiffs insist that Trader Joe's "mixes honey for which manuka is not the chief floral source with honey for which manuka is the chief floral source." Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp.") at 3. Plaintiffs not only failed to plead this allegation in the operative complaint, but they now propose additional facts that neither support their allegation of adulteration nor satisfy their obligation to plead their allegations of fraud with specificity.

#### 1. Plaintiffs' Assertions in the FAC Lack a Sufficient Factual Basis and Do Not Plausibly Allege Adulteration.

Instead of identifying specific allegations of fraudulent conduct in the FAC, Plaintiffs concede that they have not pleaded sufficient facts to state a plausible claim for relief by proffering new, unalleged facts—screenshots of YouTube videos summarized in a declaration submitted with their Opposition. As Plaintiffs are aware, "the complaint may not be amended by the briefs in opposition to a motion to dismiss." *O'Toole v. Gencor Nutrients, Inc.*, No. CV 14-3754-R, 2017 WL 6514682, at *2 (C.D. Cal. Aug. 17, 2017). The Court should disregard Plaintiffs' new allegations in the Opposition when ruling on Trader Joe's Motion to Dismiss.

Even if Plaintiffs had included the YouTube videos in their FAC, their fraud allegations would still fail. The videos show only the ordinary process of honey production and, contrary to Plaintiffs' claims, show nothing to suggest Trader Joe's adulterates its manuka honey. Plaintiffs assert that these videos support their allegation that Trader Joe's "amalgamates honey from many different hives" before testing the manuka honey and therefore "deliberately adulterates high-manuka honey by diluting it with less valuable low-manuka honey." Pl.'s Opp. at 3. Even if true, these allegations do not plausibly allege adulteration because they do not indicate that Trader Joe's diluted the Product by mixing manuka honey with ingredients other than honey such as corn

syrup or sugar.[1] To allege that Trader Joe's increased the bulk of its manuka honey with a cheaper ingredient or replaced a "valuable constituent" of the Product—the specific types of adulteration they claim—Plaintiffs must plead that Trader Joe's actually added a cheaper ingredient to lessen the Product's value. *See* 21 U.S.C. § 342(b). But Plaintiffs now seem to allege that the purported "cheaper ingredient" was, in fact, manuka honey. There is thus no basis to conclude that Trader Joe's Product contains any ingredient that lessens its value below the $13.99 retail price. There is no indication that the producer watered down the Product and no evidence of a fraudulent labeling scheme by Trader Joe's. The videos do not help Plaintiffs.

The videos, Plaintiffs allege, show that a single beehive produces at most 108 kilograms of honey, but that the producer stores honey in drums that hold approximately 288 kilograms of honey. Declaration of C.K. ("Lee Decl.") at 2. According to Plaintiffs' theory, each drum therefore necessarily contains honey from more than one hive but is only tested after the honey from different hives are mixed together. *Id.; see also* Pl.'s Opp. at 3–5. From this exercise in arithmetic, Plaintiffs jump to the wild conclusion that the producer mixes "low-manuka" honey with its higher-purity honey "for the purpose of increasing the bulk of honey that has somewhat greater than 50% manuka content by adding in honey that has less than 50% manuka honey content." Lee Decl. at 3. In short, Plaintiffs assert that the producer is purposefully balancing the manuka level by combining various different hives. Even assuming that the YouTube videos demonstrate that Trader Joe's "amalgamates numerous hives' honey before testing," the videos do not demonstrate—and Plaintiffs do not even suggest—that the honey from the various hives

---

[1] Plaintiffs identify no legal basis for their contention that mixing "high-manuka" and "low-manuka" honey constitutes adulteration. And the videos neither show nor support Plaintiffs' contention that Trader Joe's has mixed honey from "high-manuka" hives and "low-manuka" hives. *See* Pl.'s Opp. at 3. Indeed, Plaintiffs allege that honey is tested for manuka content only after it is mixed—suggesting that Plaintiffs have no basis for assuming that some hives are "high-manuka" and others are "low-manuka." Even if Plaintiffs had a basis for this allegation, it would not indicate that the product is adulterated given that Plaintiffs' example of "high-manuka honey" costs $250 a jar. If anything, mixing in high-manuka honey would only serve to make the $13.99 manuka honey more valuable.

1  used to fill each drum is not manuka honey.² Nor do they give any indication that the producer
2  even knows the manuka content of the honey from the individual hives used to fill each drum.
3  Just the opposite: the videos purportedly show honey is tested only after combined in each drum.

4        Central to Plaintiffs' bizarre adulteration theory is the notion that the honey producer
5  mixes honey from different hives—and that this mixing alone amounts to adulteration. Plaintiffs'
6  implication that honey is noncompliant unless it is packed directly from a single hive
7  fundamentally misunderstands the honey-production process.³ And it is unsupported by cases,
8  regulations, and guidance, which uniformly view "adulteration" as adding ingredients such as
9  sugar or corn syrup to honey to increase its volume. *See* FDA, Proper Labeling of Honey and
10 Honey Products: Guidance for Industry (Feb. 2018) (hereinafter "Honey Labeling Guidance").⁴
11 Plaintiffs' cited legal authority shows only that honey can be "adulterated" by the addition of
12 other ingredients—not, as Plaintiffs claim, by the addition of honey. Plaintiffs cite the FDA's
13 recent Honey Labeling Guidance for their theory that mixing honey of various hives constitutes
14 "adulteration" because it "'increase[es] [manuka honey's] bulk' with a cheaper ingredient,
15 thereby replacing a 'valuable constituent' of that product with something less valuable." Pl.'s
16 Opp. at 4. But the cited Guidance explains only that a producer adulterates honey when it
17 substitutes a **non-honey ingredient**, "e.g., sugar or corn syrup," for honey. Honey Labeling
18 Guidance at 7. Nowhere does the FDA suggest that combining the honey of various hives is
19 adulteration. *Id.*; *see also id.* at 7 ("Products that contain only honey and no other ingredients are
20 considered more valuable than a food that contains both honey and sugar or both honey and corn
21 syrup."); *id.* at 8 (FDA watches "honey for adulteration with cane or corn sugars.").

---

² Plaintiffs also do not claim that the hives are not from the same region where bees forage on the flowers of the manuka tree and do not dispute that New Zealand is the primary region for manuka honey production. *See* FAC ¶¶ 1–2.

³ Honey must be extracted from a frame and then filtered and treated to remove impurities, including inedible wax. This is a batch process that cannot practicably be performed at the level of a single hive or single frame.

⁴ *Available at* https://www.fda.gov/downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/UCM595961.pdf

Plaintiffs' theory also has no support in the case law, which has consistently seen adulteration as the addition of a *different* and *inferior* product to the advertised product, not the mixture of multiple natural sources of a product, such as honey from multiple hives or milk from multiple cows. *See, e.g.*, *United States v. Gonzalez-Alvarez*, 277 F.3d 73, 76 (1st Cir. 2002) (milk adulterated when thinned with water); *United States v. Kohlbach*, 38 F.3d 832, 833–35 (6th Cir. 1994) (orange juice adulterated when diluted with beet juice); *United States v. Two Bags, Each Containing 100 Pounds, Poppy Seeds*, 147 F.2d 123, 125 (6th Cir. 1945) (poppy seeds adulterated when white poppy seeds were colored to make them appear to be pricier Dutch blue or Turkish grey seeds). Plaintiffs fail to show how Trader Joe's "adulterated" its Product.

If the Court were to accept Plaintiffs' unsupported and half-baked theory, it would lead to absurd outcomes for producers of honey and countless other products. Honey producers may no longer be able to mix honey from different hives because even adjacent hives could contain honey with slightly different floral sources. The only way a honey producer would be able to comply with 21 U.S.C. § 342 and the FDA's Guidance under Plaintiffs' interpretation would be to bottle and test honey straight from individual hives. This would vastly increase the costs of producing honey—and drive up retail prices—by, among other things, eliminating producers' ability to filter impurities at scale. This logic would apply to other natural products, too. A gallon of milk would be "adulterated" if it were not from a single cow—or perhaps even from a single milking session. A dozen eggs would be "adulterated" if they were not all from a single chicken. And orange juice would be "adulterated" if it were not from oranges of a single tree or even a single orange.

Because Plaintiffs have not alleged that Trader Joe's mixed sugar, corn syrup, or other non-honey ingredients into its manuka honey, they have not plausibly alleged that Trader Joe's labeling its Product "manuka honey" or "100% New Zealand Manuka" honey was fraudulent, false, and misleading. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 2. Plaintiffs' Claims of Fraudulent Conduct Must be Dismissed for Failure to Meet Rule 9(b)'s Heightened Pleading Standard.

Plaintiffs cannot support their adulteration allegations and thus fail to plead claims with the particularity required by Rule 9(b). Plaintiffs argue they satisfy Rule 9(b) because the FAC "alleges all details regarding Plaintiffs' purchases and the role that Defendant's false labeling had in motivating their purchase." Pl.'s Opp. at 12. But Plaintiffs' burden is to plead with particularity that Trader Joe's plausibly "adulterated" the Product. *See Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1055 (9th Cir. 2011) (claims subject to Rule 9(b) must plead with particularity and "also plead plausible allegations" that state "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged]") (citing and quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Plaintiffs' ***only*** factual support for their "adulteration" allegations are Plaintiffs' test results, which only show that the honey is produced by bees that have foraged primarily on manuka and other native New Zealand plants. *See* FAC ¶ 56; FAC Ex. B at 55–56 (demonstrating that approximately 60% of the Product's pollen is from the manuka honey flower); *see also* Mot. to Dismiss at 7. Because Plaintiffs have not alleged that the Product is adulterated or is otherwise not "manuka honey," they fail to allege "what" is false or misleading about Trader Joe's statements, and "why it is false." *See Yumul v. Smart Balance, Inc.*, 733 F. Supp. 2d 1117, 1123 (C.D. Cal. 2010).[5]

### B. No Reasonable Consumer Would Expect the Product to Contain Exclusively Manuka Pollen.

No reasonable consumer would expect a product labeled "manuka honey"—or "clover honey" or "orange blossom honey"—to contain pollen from exclusively the manuka flower, clover, or orange blossom. Plaintiffs' assertion that the Product misleads consumers because it lists "manuka honey" on the ingredient statement thus fails. In their Opposition, Plaintiffs concede that a reasonable consumer "might think it unlikely for 'Manuka Honey' to consist in

---

[5] Plaintiffs also argue that testing batches of honey mixed from various hives contributes to adulteration. Lee Decl. at 3. Even accepting Plaintiffs' allegations as true, they do not support an inference that this results in "adulteration," and instead support the opposite inference: Testing honey in the batch from which it will be bottled ensures more accurate testing of the product.

pure[6] manuka honey <u>as a general matter</u>." Pl.'s Opp. at 5–6 (emphasis in original). But they argue that the "specific context" of the Product's label may mislead consumers to believe that the product contains only manuka pollen. *Id*. This argument has no basis: Plaintiff's idiosyncratic interpretation of the Product's label does not render it misleading.

Central to Plaintiffs' argument is the baseless notion that the Product's label would lead a reasonable consumer to conclude that the Product contains exclusively or "at least 90%" manuka pollen. Yet Plaintiffs identify no labeling statement that would lead to such a conclusion. Labeling the Product as "manuka honey," either on the ingredient statement or the front-facing label, does not represent that it contains exclusively manuka pollen, but rather—in line with FDA guidance—that manuka is its chief floral source. Plaintiffs do not show how a reasonable consumer could develop Plaintiffs' unreasonable and incorrect belief. Indeed, Plaintiffs have no explanation, as they admit that even the most expensive and purportedly "pure" product labeled as "manuka honey" contains only 90% manuka pollen.[7] This is dispositive as to Plaintiffs King and Akwei's claims and those of the putative class of consumers that purchased only the Product labeled "Manuka Honey." Plaintiff Moore's allegations—that the Product labeled "100% New Zealand Manuka Honey" is misleading—fail for the same reason. The Product *is* 100% manuka honey even if its pollen count is not 100%. Plaintiffs have not plausibly alleged otherwise. *Supra* Section II.A. As Plaintiffs admit, no manuka honey contains 100% manuka pollen. Regardless of whether a reasonable consumer would interpret the label to mean the product contains honey that comes 100% from New Zealand or contains 100% manuka honey, the representation is true because the honey comes from New Zealand and its chief floral source is manuka.

Plaintiffs' claim that the Product's labeling was misleading depends entirely on their own idiosyncratic interpretation of the labels, not that of a reasonable consumer. Plaintiffs attempt to

---

[6] Plaintiffs equate "purity" of honey with its pollen count but provide no legal basis for such a link. *See* FAC ¶ 56.

[7] Plaintiffs contend that the "Night Harvest" product is compliant even though it contains 8% pollen from flowers other than manuka and is labeled "Manuka Honey." FAC ¶ 56. Similarly, Plaintiffs assert that the use of the term "manuka honey" on Trader Joe's product would not be misleading if it contained 90% of its pollen from the manuka plant.

7

REPLY ISO MOT. TO DISMISS OR
STRIKE PL.'S FIRST AM. COMPL.
4:18-CV-04418-KAW

distract the Court from their own flawed interpretation by mischaracterizing Trader Joe's arguments. Trader Joe's Product is 100% manuka honey, but this does not imply—and no reasonable consumer would believe—it contains exclusively manuka pollen. And buyers of manuka honey, like consumers of other specialty products, are familiar with its special characteristics. Plaintiffs twist these facts into strawmen, claiming Trader Joe's position is that a reasonable consumer would not assume the Product contains "exclusively manuka money," Pl.'s Opp. at 5, and that Trader Joe's believes manuka honey consumers have "specialized" or "industry insider" knowledge. *See id.* at 5–7. These desperate attempts to recast Trader Joe's arguments do nothing to save Plaintiffs' FAC.

Trader Joe's has never conceded that its Product is anything but manuka honey. The product is 100% manuka honey, and customers can therefore reasonably expect that the Product contains "exclusively manuka honey." But Plaintiffs, using their own flawed interpretation, draw a straight line between "manuka honey" and "manuka pollen," arguing that a reasonable consumer would expect 100% manuka honey to contain 100% (or at least 90%) of its pollen from the manuka flower. But no reasonable consumer would come to that conclusion because, as Plaintiffs admit, it is impossible to produce honey exclusively from one floral source and only the most expensive manuka honey has a manuka pollen count of 90%.

Cases like *Workman v. Plum* are analogous because they show that a plaintiff's claim fails where no reasonable consumer would have misinterpreted the labels as claiming the products contained something they did not or contained more of something than they actually did. *See Workman v. Plum Inc.*, 141 F. Supp. 3d 1032, 1035 (N.D. Cal. 2015) (reasonable consumer would not assume the size of fruit depicted on a label indicated that those fruits would be present in amounts greater than other ingredients); *see also Werbel v. Pepsico, Inc.*, No. C 09–04456 SBA, 2010 WL 2673860, at *3–5 (N.D. Cal. July 2, 2010) (no reasonable consumer would believe the term "berries" in Crunch Berries cereal indicated the product contained real fruit); *McKinnis v. Kellogg USA,* No. CV 07-2611 ABC (RCx), 2007 WL 4766060, at *3–5 (C.D. Cal.

Sept. 19, 2007) (no reasonable consumer would interpret the term "froot" next to illustrations of fruit as meaning the product contained actual fruit).[8]

A reasonable consumer of manuka honey does not require "specialized" or "industry insider" knowledge to have reasonable expectations of the Product's contents or to reasonably interpret the meaning of "manuka honey." Trader Joe's has never argued otherwise. One need not be a beekeeper to understand that it is impossible to keep bees from foraging on numerous types of flowers. Indeed, Plaintiffs concede as much, alleging that "[r]easonable consumers know that the concentration of manuka as opposed to other honey pollens can vary significantly from brand to brand depending on what measures have been taken to maximize manuka purity." FAC ¶ 46. The FAC acknowledges it is impossible to produce manuka honey that does not contain pollen from other plant sources. FAC ¶ 45; Declaration of Collins Kilgore ("Kilgore Decl.") Ex. 2 at 7.[9] And Plaintiffs identify no express representations guaranteeing the Product contains a certain percentage of manuka pollen, unlike other manuka honey products described in the FAC. *See* FAC ¶ 56.

Reasonable consumers cannot be expected to have "insider" knowledge, but they are expected to have a reasonable familiarity with the products they buy, regardless of whether the product is a "specialty" product.[10] *See*, *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 512 (2003) (providing that "whether [an advertising or practice] is misleading to the public will be reviewed from the vantage point of the members of the targeted group" whether they are "more sophisticated or less sophisticated than the ordinary consumer"); *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) ("Dispenser tubes that use a screw mechanism to push up a solid

---

[8] Plaintiffs seek to distinguish these cases on the basis that Trader Joe's product contains only a single ingredient. Pl.'s Opp. at 8. This misses the point that the Product's failure to conform to Plaintiffs' own idiosyncratic interpretation of that ingredient disclosure does not violate the law.
[9] Plaintiffs did not oppose Trader Joe's Request for Judicial Notice. *See* Dkt. No. 34, 36–37.
[10] Plaintiffs assert that *Ebner* "has nothing to do with" a consumer's knowledge of "specialty products." Pl.'s Opp. at 7. Whether high-end cosmetics or manuka honey are "specialty products," is beside the point. A reasonable consumer of a particular type of product would have knowledge of the product's commonplace qualities. *See Ebner*, 838 F.3d at 967 ("When viewed in the proper context of the high-end cosmetics market, Sugar's elaborate packaging and the weighty feel of the tube is commonplace and even expected by a significant portion of Fresh's 'targeted consumers.'") (citing and quoting *Lavie*, 105 Cal. App. 4th at 508).

bullet of lip product are commonplace in the market. The reasonable consumer understands the general mechanics of these dispenser tubes and further understands that some product may be left in the tube to anchor the bullet in place."); *see Workman*, 141 F. Supp. 3d at 1035 (a consumer of fruit snacks would be familiar with the meaning of depictions of fruits and vegetables commonly placed on similar products in a grocery store). Reasonable consumers of manuka honey can be expected to be familiar with the qualities and representations of manuka products. They compare prices and grades under UMF standards—scores that indicate the concentration of manuka-related compounds in different manuka honeys. They know that manuka honeys with higher grades under UMF standards command higher prices. And they expect that higher priced honeys have a higher amount of manuka pollen. *See also* FAC ¶ 46 (alleging the value of honey increases with the concentration of pollen). Thus, because Trader Joe's Product is labeled with a grade of "10+" under UMF standards and costs only $13.99, no reasonable consumer of manuka honey would expect it to have close to the same pollen content as a product that costs over $250.

### C. Plaintiffs' State Law Claims Are Preempted and Their Labeling Claims Are Barred Because Trader Joe's Complied with Federal Law.

Plaintiffs' state law claims are expressly preempted by federal law, and their arguments to the contrary are incompatible with both well-accepted FDA guidelines and Plaintiffs' own assertions. They argue that the FDA Honey Labeling Guidance does not govern ingredient statements for honey, but they ignore that FDCA and FDA regulations require that a product's ingredient statement list the common or usual name of a food. Plaintiffs' claims, then, cannot survive unless manuka honey—unlike all other honeys—must be labeled as an amalgam of different honeys, listing each of the different types of flowers honey-producing bees visited as its own "honey" on the ingredient statement. *See* 21 C.F.R. § 101.4(a)(1). This theory is not only plainly incompatible with the FDA's instruction that honey may be labeled with the name of its "chief floral source," but it is also inconsistent with Plaintiffs' own baseless assertion that honey may be labeled "manuka honey" so long as it has at least 90% manuka pollen. Plaintiffs'

arbitrary rule differs from, and imposes requirements in addition to, the FDCA; it is therefore preempted. *See, e.g.*, *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 (9th Cir. 2018).

Plaintiffs acknowledge that the FDA's Guidance "clarifies" that "'Manuka Honey' may be permissible as the common or usual name of [the] product," but argue that the Guidance does not speak to whether Trader Joe's may list "manuka honey" as the sole ingredient. *See* Pl.'s Opp. at 15. Plaintiffs point to the FDA Guidance's answer to "How shall I name my honey?" *Id*. This portion states that the answer "pertains solely to how you name your product; other labeling requirements (e.g., net weight, nutrition facts) apply to the product." *See* Honey Labeling Guidance at 5. But the Guidance also makes clear that honey products, even honeys named by their chief floral source, require more detailed ingredient statements only when they contain ***non-honey ingredients,*** such as syrups, cane sugar, or flavoring. *Id.* at 5–6 ("If a food consists of honey and a sweetener, such as sugar or corn syrup . . . the label must, among other information include . . . [t]he common or usual name of each ingredient in the ingredient statement. In this case, the ingredient statement would show 'honey' and the common or usual name of the sweetener (e.g. 'sugar,' 'corn syrup'), in descending order of predominance by weight.").

Contrary to Plaintiffs' allegations, the FDA Guidance (*see* Honey Labeling Guidance at 5–6) does not require honey producers to list "various types of honeys in the Product in descending order of predominance." *See* Pl.'s Opp. at 17. And Plaintiffs identify no basis for their theory that the different pollens in honey mean the product is composed of different "ingredients." Instead of requiring producers to list of all the flowers or trees a bee may have visited, the FDA's Guidance instead contemplates that a honey labeled by its "chief floral source" is a "single-ingredient food" such that no ingredient statement is required at all; let alone an ingredient statement listing all floral sources. *See* Honey Labeling Guidance at 5 ("The common or usual name may also include the source of the honey, such as 'Clover Honey,' on the label.… Because honey is a single-ingredient food, you do not need to include an ingredient statement on the label.").

Plaintiffs also do not contest that the Nutrition Labeling and Education Act's ("NLEA") requirements for food labeling fall within the "domain" of the NLEA's express preemption provision or that the FDA's Honey Labeling Guidance informs the intended "domain" of the NLEA's ingredient statement requirements or regulations requiring food be labeled by its "common or usual name." Pl.'s Opp. at 13–18.[11]

Despite Plaintiffs' arguments to the contrary, their claims attempt to enforce federal laws that provide no private cause of action and thus are impliedly preempted.[12] Pl.'s Opp. at 17–18. Specifically, Plaintiffs argue that Trader Joe's has not demonstrated how their state law claims are "logically reliant" or dependent on the Federal Food, Drug & Cosmetic Act. *Id*. at 18. Plaintiffs' allegations, however, rely on and indeed seek to enforce federal law requirements. Plaintiffs' central allegation, reinforced in their Opposition brief, is that the Product's representations are false or misleading because the Product is not "manuka honey" but rather a "blend" of honeys, such that the common or usual name is not "manuka honey" and the ingredient list should instead describe each floral source in descending order or else the product should only be labeled "honey." *See, e.g.*, *id.* at 16–17 ("Listing manuka honey as the sole ingredient would create 'an erroneous impression' that the Product is pure manuka."). Plaintiffs seek to enforce 21 C.F.R. § 101.4(a)(1) and the FDA's honey labeling guidelines, and the claims are impliedly preempted.[13]

Finally, because Trader Joe's complies with the FDCA and the FDA's regulations, the safe-harbor doctrine bars Plaintiffs' claims. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel.*

---

[11] Plaintiffs also seem to backtrack from their assertion that the "common or usual name of the product sold by [Trader Joe's] is 'Manuka-based honey blend.'" FAC ¶ 16. The FDA's Honey Labeling Guidance states only that products mixing honey with **non-honey** ingredients must carry a name indicating the blend. *See* Honey Labeling Guidance at 5 (if a food consists of honey and corn syrup, for example, the label must carry a statement of identity like "Blend of honey and corn syrup").

[12] Some courts have held that California claims are not preempted where they are consistent with the FDCA because California's Sherman Law incorporates the FDCA's labeling regulations. *In re Trader Joe's Tuna Litig.*, 289 F. Supp. 3d 1074, 1084–85 (C.D. Cal. 2017). New York and North Carolina have no law incorporating the FDCA.

[13] Plaintiffs also assert that their claims are not preempted even if the Product is not adulterated. Pl.'s Opp. at 13. Stripped of adulteration allegations, however, Plaintiffs have no claim that the Product fraudulently represents that it contains only manuka honey.

1  *Co.*, 20 Cal. 4th 163, 182 (Cal. 1999); *Ebner*, 838 F.3d at 963; *Am. Home Prods. Corp. v.
2  Johnson & Johnson*, 672 F. Supp. 135, 144 (S.D.N.Y. 1987); *Duke v. Flying J, Inc.*, 178 F. Supp.
3  3d 918, 926 (N.D. Cal. 2016). Trader Joe's appropriately labels its Product with the common or
4  usual name of the only ingredient ("manuka honey"), in line with federal regulations. *See* 21
5  U.S.C. § 343(i)(2); 21 C.F.R. § 102.5(a), (d); *see also* Honey Labeling Guidance; FDA,
6  Compliance Policy Guide § 515.300, Honey – Source Declaration (1980). Even if Plaintiffs'
7  claims were not expressly or impliedly preempted, Trader Joe's labeling is lawful and thus falls
8  within the safe-harbor doctrine. *See, e.g., Ebner*, 838 F.3d at 963.

### D. Plaintiffs' Breach of Express Warranty Claims Fail Because the Product Does Not Make Any Express Representation That Is Untrue.

Plaintiffs have not alleged that the product expressly warrants that it contains exclusively manuka pollen or at least 90% manuka pollen, and their claims for breach of express warranty thus fail. *See Forouzesh v. Starbucks Corp.*, 714 F. App'x 776, 777 (9th Cir. 2018); Mot. to Dismiss at 21–22.

### E. Plaintiffs Cannot Proceed with a Nationwide Class.

Plaintiffs argue they should be allowed to proceed with a nationwide class action relying only on California law, despite clear differences between the laws of California and other states and the fact there are no named Plaintiffs from 48 of the jurisdictions in which the purported class resides. Pl.'s Opp. at 19–23. Specifically, Plaintiffs argue that deciding whether California law can be applied to the claims of out-of-state class members requires the "thorough choice-of-law analysis that underpinned the *Mazza* decision." *Id.* at 19–20. Applicable here are the *Mazza* court's findings that common issues of law did not predominate. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012). There, the court held that differences between California's CLRA, FAL, and UCL—the same laws at issue here—and the consumer protection laws of other jurisdictions were material so that California law could not be applied to the entire class. *Id.* (California imposes no scienter requirement, requires a showing of reliance, and provides remedies that differ from other states' laws). Other courts have noted that the statutes of

limitations for various states' consumer protection laws vary from one to ten years. *See, e.g.*, *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1100–01 (C.D. Cal. 2012). Because of these material differences, the application of California law would be improper here. *See, e.g.,* N.J. Stat. Ann. § 56:8–2 (requiring knowledge and intent for omissions); *Dabush v. Mercedes-Benz USA, Inc.,* 874 A.2d 1110, 1121 (N.J. Super. Ct. App. Div. 2005) (private plaintiff must prove a causal nexus between misrepresentation and damages); N.J. Stat. Ann. § 56:8–19.1 (providing treble damages and attorneys' fees). States also have a strong interest in setting the "appropriate level of liability for companies conducting business within its territory," and California has little interest in applying the CLRA, UCL, and FAL to foreign residents.[14] *Mazza*, 666 F.3d at 591–94.

Plaintiffs argue that the choice-of-law analysis is not appropriate at the motion to dismiss stage. Pl.'s Opp. at 19. But courts conduct the choice-of-law analysis at this stage where, as here, preparing a more robust factual record will not materially impact the choice of law analysis. *See Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1007–08 (N.D. Cal. 2014); *Route v. Mead Johnson Nutrition Co.*, No. CV 12–7350–GW(JEMx), 2013 WL 658251, at *7–9 (C.D. Cal. Feb. 21, 2013). Here, the pleadings make clear that Plaintiffs seek to apply California law to the entire class, so the Court "need not wait to decide whether material differences exist between the . . . states' laws." *See Frezza v. Google, Inc.*, No. 5:12–cv–00237–RMW, 2013 WL 1736788, at *7 (N.D. Cal. Apr. 22, 2013).

Finally, Plaintiffs assert they may bring claims on behalf of class members residing outside of California, New York, and North Carolina under each state's respective consumer-protection laws. Pl.'s Opp. at 22–23. Plaintiffs argue that California has not resolved this issue of standing, that cases cited by Trader Joe's were decided "as a matter of discretion" and not Article III standing, that two named Plaintiffs reside outside California, and that Trader Joe's has not alleged any discovery-related burdens. *Id.* Several courts have, under similar circumstances, required that "plaintiffs present named class representatives who possess individual standing to

---

[14] Plaintiffs also argue that *Mazza* is distinguishable because, unlike there, Plaintiffs transacted "directly" with Trader Joe's rather than a middleman. Pl.'s Opp. at 21. Even if the distinction is material, the California Plaintiff in fact alleges to have purchased the product from Amazon.com rather than directly from Trader Joe's. FAC ¶ 26–27.

1  assert each state law's claims against [a defendant]." *See, e.g.*, *Johnson v. Nissan N. Am.*, 272 F.
2  Supp. 3d 1168, 1175 (N.D. Cal. 2017). Courts have also rejected nationwide classes when the
3  number of named plaintiffs is disproportionately small compared to the number of state laws
4  under which plaintiffs wish to assert claims. *Compare In re Carrier IQ, Inc.*, 78 F. Supp. 3d
5  1051, 1074–75 (N.D. Cal. 2015) (class action could not proceed on behalf of consumers from 48
6  states where named plaintiffs only came from 13 of those states), *and Johnson*, 272 F. Supp. 3d at
7  1175 (rejecting nationwide class where only two named plaintiffs from two states purported to
8  bring claims under 50 states' laws), *with In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp.
9  3d 1154, 1159–60 (D. Minn. 2014) (plaintiffs plausibly alleged standing for nationwide class
10 when 114 named plaintiffs resided in every state except four and the District of Columbia). Here,
11 named plaintiffs from only three states seek to assert claims under the laws of all fifty states and
12 the District of Columbia.[15] FAC ¶ 14. Contrary to Plaintiffs' claim that the discovery burden
13 would be minor because the Product is sold in "uniform conditions" in Trader Joe's stores,
14 Plaintiffs are asserting their claims on behalf of ***all*** Product consumers, even those that purchased
15 the Product on the secondary market, such as through Amazon.com and potentially other online
16 resellers. *See* FAC ¶¶ 21, 42. Trader Joe's will thus have to seek discovery from third parties
17 related to sales in all fifty-one jurisdictions. Information within Trader Joe's and Plaintiffs'
18 possession will be insufficient to prepare for class-certification and trial.

### III.   CONCLUSION

Trader Joe's sold a genuine, properly labeled product at a reasonable price. Plaintiffs have not alleged any facts to suggest otherwise. Instead, they rely on baseless and bizarre theories—none of which are backed up by legal authority, case law, or common sense. Their First Amended Complaint should be dismissed with prejudice.

Dated: March 1, 2019             BY:   */S/ DAWN SESTITO*
                                        Dawn Sestito

---

[15] Trader Joe's does not operate stores in all 50 states and therefore never sold the Product in several of the states in which Plaintiffs purport to represent a class of purchasers.